O

JS - 6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

|  |  |
|---|---|
| VINCE CATANHO | Case No. CV 06-2496 CAS (JTLx) |
| Plaintiff, | Case No. CV 06-2568 CAS (JTLx) |
| vs. | **FINDINGS OF FACT AND** |
| UNITED STATES OF AMERICA, | **CONCLUSIONS OF LAW** |
| Defendant. | |
| ESTATE OF SAUL CERROS, et al., | |
| Plaintiffs, | |
| vs. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

        This action seeking relief under the Federal Tort Claims Act (the "FTCA"), 28
U.S.C. §§ 1346(b), 2671 et seq., arises out of the September 22, 2004 shooting of
Vincent Catanho ("Catanho") and Saul Cerros ("Cerros") by Naval Security Officer
John Tate  ("Tate") at the Naval Air Station, North Island, Coronado ("the Base").
Catanho was wounded, and Cerros was killed.

1    On April 24, 2006, Catanho filed suit against the United States and Does 1
2    through 10.  On April 28, 2006, the Estate of Saul Cerros and Cerros' surviving spouse,
3    Dinah Cerros, minor children, S.C. and A.C., and dependent parents, Lucilia Cerros and
4    Baudelio Cerros (collectively, the "Cerros plaintiffs"), filed suit against the United
5    States ("the Government")  and Does 1 through 50.  On March 12, 2007, the Court
6    consolidated these cases.  On June 1, 2007, plaintiffs filed their operative second
7    amended complaints.  Catanho and the Cerros plaintiffs assert claims for assault,
8    battery, and negligence.  The Cerros plaintiffs also assert a claim for wrongful death.

9    This action was tried to the Court.  Trial commenced January 21, 2009, and
10   concluded on January 23, 2009.  John Y. Lee and James S. Muller appeared for
11   Catanho.  Muller also appeared on behalf of the Cerros plaintiffs.  United States
12   Attorney Thomas P. O'Brien and Assistant United States Attorney Jason Axe appeared
13   for the United States.  The Court, having considered the testimony and other evidence
14   admitted at trial, the briefs of the parties, and the arguments of counsel, makes the
15   following Findings of Fact and Conclusions of Law.

17                           **FINDINGS OF FACT**

18   1.    On September 22, 2004, Catanho and Cerros, as well as their companion
19   Patrick Roybal ("Roybal"), left Los Angeles in a sports utility vehicle ("the SUV"),
20   heading toward Tijuana, Mexico.  Catanho Dep. 25:25-26:5.  While en route, the men
21   smoked marijuana in the SUV.  Catanho Dep. 26:18-21.

22   2.    At approximately 10:00 p.m., the men drove into the "No-Decal" parking
23   lot outside the Base with the intention of stealing a motorcycle.[1]

─────────────────

25   [1] Although Catanho invoked his Fifth Amendment privilege against self-
26   incrimination when asked if the men had intended to steal motorcycles, Catanho Dep. 26:6-
27   17, in their proposed findings of fact and conclusions of law and in their closing trial briefs,
                                                              (continued...)

3.      The "No-Decal" parking lot is a lot where military personnel who do not have official decals on their vehicles can park their vehicles immediately outside the Base.  The lot is surrounded by a concrete "blast wall," with steel-enforced fencing on top.  Tr. Trans. 1:31:15-22, 33:2-4.  There is only one entrance or exit into the lot.  Tr. Trans. 1:32:24-33:1.

4.      Prior to September 22, 2004, motorcycles had been stolen from the "No-Decal" lot.  Trial Tr. 1:28:6-9, 1:31:23-25; Sadler Dep. 23:17-24:4.

5.      The SUV drove to the far corner of the parking lot where motorcycles were parked.  Cerros exited the SUV, mounted a motorcycle, and started it.   Catanho Dep. 27:15-18.  Cerros then got back into the SUV, and instructed Roybal to mount the motorcycle and follow the SUV out of the parking lot.  Catanho Dep. 28:10-14.  Cerros drove the SUV toward the exit and Roybal followed on the motorcycle.  Catanho Dep. 28:23-29:16.

6.      Patrolman Erik Sadler ("Sadler") was working as a sentry, watching the Base and its surroundings from a tower next to the "No-Decal" lot.   Sadler received a call from Officer Resendez, notifying Sadler that an individual had been observed looking into cars in the parking lot.  Sadler left his post and went to the fence separating the tower from the parking lot.  Sadler Dep. 24:12-18.  He then saw the SUV pull into the lot, and pull next to the motorcycles.  Sadler Dep. 25:5-19.  As he saw Cerros attempt to start a motorcycle, he placed a radio call to dispatch informing them of a

---

[1](...continued)
plaintiffs have conceded this point.  See, e.g., Cerros Pls.' Closing Br. at 3.  Moreover, "when a party asserts the privilege against self-incrimination in a civil case, the district court has discretion to draw an adverse inference from such assertion."  Nationwide Life Ins. Co. v. Richards, 541 F.3d 903, 911-12 (9th Cir. 2008), citing Doe v. Glanzer, 232 F.3d 1258 (9th Cir. 2000).  Based on the facts as presented, including but not limited to Catanho's invocation of the Fifth Amendment privilege, the fact that the motorcycle did not belong to Catanho, Cerros, or Roybal, and the men's subsequent evasion of the police, the Court concludes the men were attempting to steal the motorcycle.

possible theft in progress at approximately 10:00 p.m.  Sadler Dep. 26:16-25.

**A.     Naval Officers Respond to the Scene**

7.     In response to that call, Tate responded to the scene along with his partner, Naval Security Officer Joseph Ferrer ("Ferrer"), in a white, clearly marked police vehicle (referred to as a "GOV").  Trial Tr. 1:32:1-8, 1:33:8-15; 3:65:18-66:7.

8.     At all relevant times, Tate was an employee of the Government acting within the scope of his employment.

9.     When Tate and Ferrer arrived, they observed the SUV driving in the northwest corner of the lot.  Tate also heard a motorcycle engine start.  At that point, Tate backed the GOV in front of the exit, almost completely blocking it.  Trial Tr. 1:33:19-34:9, 1:35:12-15, 1:37:1-4; 3:66:8-19.

10.     One end of the GOV was roughly aligned with the post at the eastern end of the exit, and the other end was approximately four to six feet from the post at the western end of the exit.  The GOV was slightly north of the posts.  Trial Tr. 1:34:2-9.  The position of the GOV and the post created a "channel" through which anything exiting or entering the lot had to pass through ("the channel").  Trial Tr. 2:7:3-7.

11.     As the SUV and motorcycle continued to move toward the exit, Cerros and Catanho noticed the exitway was blocked by the GOV.  Catanho Dep. 29:13-16, 30:9-17.  The SUV pulled up alongside the passenger's side of the GOV, and the motorcycle was behind it.  Trial Tr. 1:37: 5-9

12.     Tate and Ferrer then exited the GOV.  Trial Tr. 1:37:23-25, 3:66:23-67:2.  Ferrer made contact with the motorcycle rider.  Tate approached the SUV, and asked the individuals inside the SUV for their identification.   Trial Tr. 1:38:1-15, 3:66:25-67:2.  Although Catanho noticed the officers, he testified that he did not hear any conversation between them and Cerros.  Catanho Dep. 31:3-12.

13.     According to Tate, the individuals in the car responded that they had to retrieve their IDs, and instead  "took off" in the SUV in a westwardly direction past the

GOV.  Trial Tr. 1:37:16-19.  The  motorcycle followed behind it.  The SUV and motorcycle moved to the northwest corner of the lot where they parked in a parking stall.  Catanho Dep. 31:22-32:8; Trial Tr. 1:38:20-39:4; 3:67:16-68:1.

14.    At around this same time, two more officers, Sergeant Richard Crowl and Petty Officer Villanueva arrived on the scene, also responding to the 10:00 p.m. radio call.  Trial Tr. 3:44:7-24.  Upon arriving, they exited their GOV, which they parked behind Tate's.  Crowl instructed Villanueva to wait near Tate.  Trial Tr. 3:45:11-13.  Crowl and Ferrer went to the northwest corner of the lot to investigate the SUV and motorcycle.  Trial Tr. 3:45:18-24.

15.    Cerros and Catanho exited the SUV, and approached the motorcycle, which Roybal dismounted. Catanho Dep. 32:16-21; Trial Tr. 3:46:4-6.  Crowl testified he saw one of either Cerros or Catanho grab something from the inside of the SUV and put it in his pocket.  Trial Tr. 3:46:6-10.  Upon seeing this, Crowl and Ferrer drew their weapons.  Trial Tr. 3:46:14-20; 3:68:19-69:12.  Crowl ordered Cerros and Catanho to stop and show him their hands.  Trial Tr. 3:46:21-25, 3:69:13-15.  Tate testified he saw this, and presumed a threat existed.  Trial Tr. 1:101:1-13.

16.    Cerros and Catanho then mounted the motorcycle, with Cerros driving, and Catanho behind Cerros with his arms wrapped around him in a "bear hug."  Catanho Dep. 8:6-18; 33:2-4.

17.    Tate observed a commotion, including yelling and people moving the various vehicles around in different directions.  Trial Tr. 1:101:17-25. Tate then heard the motorcycle moving and saw it as it arrived in the northeast corner of the lot.  Crowl ordered Catanho and Cerros to halt; they did not.  Trial Tr. 1:39:22-41:2; 3:46:21-25.  The motorcycle drove in circles around the lot, at speeds estimated by Crowl to range from 10 to 15 miles per hour on turns and 30 to 40 miles per hour on straightaways.  Trial Tr. 3:47:7-22, 69:16-20.

18.    The motorcycle proceeded south past Ferrer, who also ordered Catanho

and Cerros to halt.  Trial Tr. 3:69:20-25.  As the motorcycle passed him, Crowl told Ferrer to deploy his oleoresin capsicum, or "OC," spray.  Ferrer attempted to do so, but was not successful, as Catanho swung his hand at the container and swatted it out of Ferrer's hand.  Trial Tr. 3:48:7-19, 3:70:10-25.

19.     Tate testified he saw Ferrer approach the motorcycle, but then back away with his hands raised and appeared to Tate to draw his weapon.   Trial Tr. 1:50:14-20, 1:51:2-13, 1:99:24-100:8.

**B.      The Motorcycle Approaches Tate**

20.     The motorcycle then turned south toward Tate. Trial Tr. 1:52:7-16, 1: 102:19-103:2, 3:48:20-23, 3:71:1-3.

21.     When the motorcycle turned, it was approximately 30 to 40 feet away from Officer Tate.  Trial Tr. 1:55:20-23, 1:62:25-63:2.

22.     Crowl, Ferrer, Sadler and Tate all testified that, seconds later, the motorcycle increased its speed as it drove toward Tate.[2]  Trial Tr.  1:104:14-21, 1:121:14-122:10, 3:48:20-49:10, 3:71:4-11; Sadler Dep. 36:4-6, 37:2-7.

23.     Tate testified that he was standing alongside the front passenger headlight of the GOV.  Trial Tr. 1:58:19-25, 1:102:5-18.   Catanho testified that Tate was standing 6 to 10 feet north of the GOV.  Catanho Dep. 13:6-8.  Ferrer testified Tate was standing in between the headlight and the middle of the vehicle, in the channel. Trial Tr. 3:71:12-23.

24.     Both Sadler and Tate testified that, as the motorcycle approached Tate, they saw Cerros "pop the clutch," shifting into gear and placing a lot of power on the

---

[2] The witnesses gave varying estimates of the speed of the motorcycle. The variation was not significant enough, however, to find any substantial variance in their testimony. Tate and Sadler estimated the speed to be 20 to 25 miles per hour, Ferrer estimated the speed to be 25 to 30 miles per hour, and Crowl testified that the motorcycle reached a maximum speed of about 30 miles per hour, about 20 feet from Tate. Trial Tr. 1:62:16-23; 3:49:7-10; 3:71:9-11; Sadler Dep. 39:14-17.

1   back tire.  The extra power in the rear caused the front of the motorcycle to lift up,

2   which Tate could see as the headlight rose.  Trial Tr. 1:55:14-19; 1:103:24-104:16;

3   1:115:2-12; Sadler Dep. 36:16-20.  Catanho testified that Cerros never popped the

4   clutch.  Catanho Dep. 45:11-13.

5        25.    Tate gave Cerros several commands to stop, which went unheeded.   Trial

6   Tr. 1:55:24-56:6; 1:104:22-105:1; 3:71:24-72.

7   **C.    Tate Fires at the Exiting Motorcycle**

8        26.    As the motorcycle got closer to him and eventually was passing him to exit

9   the lot, Tate fired three shots at the motorcycle.

10       27.    At trial, the parties focused on the latter two shots, as these

11  were the ones that caused serious and fatal injury.  These two shots hit Catanho in the

12  left arm and Cerros in the torso.  Cerros' wound proved fatal.  Catanho experienced

13  only minor injuries.  It is unclear which shot hit which man.[3]

14       28.    Given the range of testimony provided by each witness, the exact positions

15  of Tate and the motorcycle at the time of each shot cannot be established with any

16  certainty, although some positions can be eliminated and others included as more likely.

17       29.    Catanho testified that 1.5 to 2 seconds elapsed between when he first saw

18  Officer Tate standing about 4-5 feet in front (south) of him, and when he and Cerros

19  had fully exited the parking lot.  Catanho Dep. 42:21-25.

20       30.    Plaintiffs' expert Dr. Mortimer Moore testified that it takes about 2.25

21  seconds after the decision to fire to actually execute a shot.  Trial Tr. 2:26: 12-17.  All

22  of the timing and measurement estimates given by Dr. Moore were based on when the

23

24  _____

25       [3] Catanho testified that the second shot hit him in the back of his left arm as he
26  leaned forward, with his arms wrapped around Cerros. Catanho Dep. 14:14-15:5.
    Plaintiffs' expert Dr. Mortimer Moore's analysis assumed the second shot hit Cerros. Trial
27  Tr. 1:134:1-19.  Defendant's expert Dr. Stanley Adams could not determine the order of
    the two shots based on the available evidence.  Trial Tr. 2:170:18-20.

28

bullet left the chamber of Tate's gun.  Trial Tr. 2:40:9-12.  Dr. Moore did not opine as to the locations of the motorcycle, motorcyclists, or Tate when the decision to fire was made.

### The First Shot

31.     The first shot went directly into the front of the motorcycle.  Trial Tr. 2:16:9-15; 2:155:23-156:1.  Fragments from the bullet struck Cerros' wrist.  Catanho testified he felt Cerros' body jerk to the right upon impact.  Catanho Dep. 14:10-13.

32.     Tate fired this shot directly ahead as he was facing north, indicating the motorcycle was still in front of him.[4]  Tate testified that, at this time, he was in the "ready weaver" position, with his arms extended and his weapon pointed downward.  Trial Tr.  1:56:7-23.  He was standing approximately one foot to the left (west) of the front of the GOV.  Trial Tr. 1:58:19-25.

33.     Tate gave varying testimony as to the speed at which the motorcycle was traveling, indicating in his deposition that was going approximately 10 miles per hour, and at trial indicating a speed of 20 to 25 miles per hour.  Trial Tr. 1: 62:16-23, 121:14-17.  Ferrer testified the motorcycle was  traveling at a speed of 20 to 30 miles per hour.  Trial Tr. 3:77:19-21.

34.     Plaintiffs' own witness, Dr. Moore, agreed that, at the time Tate fired the first shot, the oncoming motorcycle was "certainly" a threat  "from Tate's point of view.  Trial Tr. 2:61:9-62:7; 2:68:1-69:16.

_____

   [4] Tate gave varying testimony as to how far the motorcycle was from him when he fired the first shot, indicating that it was "a little farther" than four to six feet, seven and a half feet, ten to fifteen feet, and twenty to twenty-five feet ahead of him.  Trial Tr. 1:60:3-6, 77:9- 78:12, 120:22-121:13.  Plaintiffs' expert Dr. Moore indicated the bullet made impact with the motorcycle between 7.6 and 7.9 feet from Tate.   Trial Tr. 2:13:18.  Ferrer testified the motorcycle was five to seven feet from Tate at the time of the first shot. Trial Tr. 3:77:12-14. These discrepancies appear to be irrelevant to the ultimate issue in this case, namely Tate's perception of danger at the time the fatal and wounding shots were fired.

35.    The first shot had no apparent effect, and the motorcycle continued to approach Tate.  Trial Tr. 1:58:2-11.

### The Second and Third Shots

36.    As the motorcycle approached Tate, he fired an additional two shots in rapid succession.  Trial Tr. 1:59:15-20; 1:108:16- 109:13.

37.    The timing and positions of Tate, his weapon, the motorcycle, and the riders in relation to the second and third shots were all addressed by conflicting eyewitness testimony, as well as plaintiffs' expert Dr. Moore and defendant's expert Dr. Adams.  Both experts noted that there were "several possible paths" of the motorcycle, though only Dr. Adams admitted that based upon the physical evidence and conflicting testimony, there is no way to say with any certainty exactly what occurred.  Trial Tr. 2:99:7-99:15; 2:171:23-173:9; 3:16:2-11; 3:18:9-20; 3:21:17-23:2.   The expert analyses could merely establish some possibilities and eliminate others.

38.    The only objective evidence either expert had to consider was the angle of two of the gun shots, determined based on the entry and exit points of the first bullet, which struck the motorcycle, and one of the other bullets, which struck Cerros.  Both Drs. Moore and Adams used the entry and exit points to conduct a trajectory analysis, which formed the basis for their opinions as to the possible or likely positions of Tate and the motorcycle.  See, e.g., Trial Tr. 1:127:16-140:22; 2:155:12-159:17.

39.    Knowing the angle of the bullet alone does not provide sufficient information to determine Tate's location relative to the motorcycle.  There are at least six unknown or disputed additional variables which effect this calculation: (1) how far the gun was held out from Tate's chest and at what angle; (2) the height at which the gun was held; (3) the angle or tilt of the motorcycle; (4) the position of the riders on the motorcycle; (5) the direction in which the motorcycle was traveling; and (6) the speed of the motorcycle.  A change in any one of these variables would yield different results under any possibly reliable analysis.  See Trial Tr. 3:28:3-29:17.

40.    Dr. Moore testified that .6 to .9 seconds elapsed between the first and second shot.  Trial Tr. 2:23:7-9.  He also testified that, after the first shot, Tate moved 4.6 feet to the east, ending up between 3.2 and 5.54 feet from the edge of the channel created by the front of the GOV.   Trial Tr. 2:10:11-14; 11:23-12:1.  Dr. Moore calculated that the motorcycle advanced 10.6 feet between the first and second shots, and was between four and six feet from Tate when the second shot was fired, "just marginally south of the [northern] edge of the [GOV]."  Trial Tr. 2:10:15-17; 11:16-17; 12:20-13:5; 21:7-21.   He also somewhat contradictorily testified that Cerros, who was on the motorcycle, was 6.6 feet due west ("just opposite") of Tate  when the second shot was fired.   Trial Tr. 2:18: 2-9; 19:23-25.

41.    Dr. Moore's analysis is based on several assumptions, including that the motorcycle was in a straight upright position as it proceeded in a straight southward path, approaching and traveling through the channel to exit the lot, Trial Tr. 2:47:4-21; 2:70:8-24; 2:81:10-22; 3:26:19-22.  Dr. Moore further assumed that the riders on the motorcycle were in a prone position, Trial Tr. 2:81:23-82:19, that 3.38 seconds elapsed between the second and third shots, Trial Tr. 2:19:18-22, that the motorcycle had gone completely south of Tate at the time the third shot was fired, Trial Tr. 2:19:1-14, and that the motorcycle was traveling at 10 miles per hour, Trial Tr. 2:54:6-55:8; 3:26:22-27:12.  This analysis accepted as true the statement of Catanho, a convicted felon who was under the influence of marijuana and attempting to flee the scene of a crime, and rejected the testimony of several officers, including Tate.   Trial Tr. 2:55:1-17.  Dr. Moore did not conduct any analyses at speeds of 15 to 30 miles per hour, which several more credible witnesses indicated was a more accurate speed.  See, e.g., Trial Tr. 1:67:23-68:8; 3:73:21-24.

42.    At his deposition, Dr. Moore concluded that the motorcycle was leaning to the left as it drove through the channel.   Trial Tr. 2:57:14-24.  At trial, however, Dr. Moore testified that, due to the narrow width of the channel, the motorcycle was upright

and proceeding in a straight southward direction.  Trial Tr. 2:70:13-24.  At no point prior to trial did Dr. Moore or plaintiffs inform the government of this change in opinion, in violation of Fed. R. Civ. Pro. 26(e)(1).  Dr. Moore's explanation that he thought the deposition was going to continue at a later date is insufficient to relieve plaintiffs of their duty under Rule 26(e).  Trial Tr. 2:58:3-59:4.  While the Court does not strike Dr. Moore's revised opinion, the fact that his opinion changed without notice or a detailed explanation as to why the opinion changed reflects, in the Court's view, upon the persuasiveness of the opinion.

43.     Based on his analysis, which acknowledged the uncertainty as to several factors, Trial Tr. 3:11:11-12:10, defendant's expert Dr. Adams testified that the two shots could have been fired anywhere from three feet before the motorcycle  passed Tate to three feet after the motorcycle passed Tate, with Tate at least two feet from Cerros.  Trial Tr. 3:8:20-24.  His "favored interpretation" was that the shots were fired as the motorcycle was passing Tate.  Id.  Dr. Adams also testified that, given the location of Catanho and Cerros' gunshot wounds, and the downward trajectory of the shot, it is most likely that the motorcycle was leaning left toward Tate when he  fired the second shot.  Trial Tr. 3:17:18-1:20.  For the motorcycle to have been perfectly upright, Dr. Adams testified, the driver "would have to have twisted his torso in a markedly abnormal way for driving a motorcycle."  Trial Tr. 2:164:8-10.

44.     Catanho testified that Tate  was standing six to eight feet north of the GOV, parallel to the side-view mirror at the time the shots were all fired.  Catanho Dep. 16:10-18.

45.     Crowl testified he saw Tate stepping back and away from the oncoming motorcycle at this point at the time he fired the second and third shots.  Trial Tr. 3:51:18-22.

46.     Ferrer testified that the motorcycle began to lean toward the right[5] as it approached Tate, making a half arc toward the exit of the parking lot.  Ferrer estimated that, at the point closest to Tate along this arc,  the motorcycle was 1 to 2 feet from Tate. Trial Tr. 3:72:24-20.

47.     Tate testified that when he saw the motorcycle coming toward him after the first shot, he began pulling his arms in toward his body and turning to follow the motorcycle, while walking backwards along the edge of the channel, ending somewhere between the center of the front of the GOV and the driver's side corner of the GOV.  Trial Tr. 1:63:3-11.

48.     At the time of the second shot, Tate testified the motorcycle was still coming toward him, though he was uncertain as to whether it was four to six or ten to fifteen feet away from him.  Trial Tr. 1:70:19-23; 1:76:19-77:8; 1:117:8-11.  Tate estimated his arms were drawn in to about six inches from his body at the time of the second shot.  Trial Tr. 1:116:18-24; 1:117:5-7.

49.     At the time of the third shot, Tate explained he had pulled his arms completely into his chest and his body and arms were facing due west.  Trial Tr. 1:64:12-19; 1:72:19-1:73:4; 1:116:12-16.  This is consistent with Dr. Moore's testimony that there was no way the shooter could have been standing facing northward when the third shot was fired.  Trial Tr. 2:28:3-16.  Tate testified that the motorcycle was "right on" him at the time of the third shot.  Trial Tr. 1:112:25-113:1.

50.     Tate testified that he fired  the first shot to stop the motorcycle, and the second and third shots in self-defense, as he thought he was going to be hit by the motorcycle as it came his way.  Trial Tr. 1:64:12-19, 1:110:10-16, 1:113:9-19.  Both Ferrer and Crowl testified that they thought the motorcycle was going to hit Tate.  Trial

---

[5] Neither party explored this apparent inconsistency in the direction the motorcycle was leaning.  Given the direction in which the parties agree the motorcycle was traveling before its left turn out of the lot, any lean would have to have been toward the left.

Tr. 3:51:6-18, 3:52:3-10; 3:73:25-74:2.

51.     Evidence produced at trial strongly supports the conclusion that Tate could not have been standing in the channel when he fired the second and third shots.  The channel was a total of 4.26 ft wide.   Trial Tr. 2:7:6-9.  The handlebars of the motorcycle were 2.34 feet wide.  Trial Tr. 2:7:10-13.  Depending on how close to the western post the motorcycle was, this would leave a maximum of 1.92 feet of space between the GOV and the post as the motorcycle passed through, and if the motorcycle was perfectly centered as it passed through the channel, there would be less than one foot between the GOV and the motorcycle.  Trial Tr. 2:9:1-3.  Since ballistics analysis demonstrated that the weapon was fired from greater than two feet away from the riders, and less than two feet of space existed in the channel, Tate could not have been standing in the channel when the shots were fired.  *See* Trial Tr. 2:34:17-35:2; 3:8:20-24.

52.     After the third shot, the motorcycle exited the parking lot and made a left hand turn.

53.     To the extent necessary, each of the foregoing findings of fact may be deemed to be a conclusion of law.

## CONCLUSIONS OF LAW

**I.    Jurisdiction and Venue**

1.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1346(b)(1).

2.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because all plaintiffs reside in this judicial district and no real property is involved in the action.

**II.    Legal Standards**

**A.    Liability Under the FTCA**

3.     The FTCA provides that the United States may be held liable for "personal injury or death caused by the negligent or wrongful act or omission of any employee of

the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be held liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).  The term "employee of the Government" includes "members of the military or naval forces of the United States."  28 U.S.C. § 2671.

4.     In actions brought under the FTCA, the Government is liable "in the same manner and to the same extent as a private individual under like circumstances" and is "entitled to assert any defense based upon judicial or legislative immunity which otherwise would have been available to the employee of the United States whose act or omission gave rise to the claim, as well as any other defenses to which the United States is entitled."  28 U.S.C. § 2674.

Under existing case law, it is unclear whether this language allows the Government to assert privileges and defenses unique to law enforcement officers under California state law.  In  United States v. Olson, 546 U.S. 43 (2005), the Supreme Court held that (1) "the [FTCA] requires a court to look to the state-law liability under the FTCA 'in the performance of activities which private persons do not perform,'" 546 U.S. at 45, and (2) "the words 'like circumstances' do not restrict a court's inquiry to the same circumstances, but require it to look further afield" in seeking an analogy between the allegations against the government and similar conduct by private persons. 546 U.S. at 46.

The Ninth Circuit examined Olson and its effect on cases alleging wrongful death or assault and battery by law enforcement officers in  Tekle v. United States, 511 F.3d 839 (9th Cir. 2007), but produced no majority opinion on the FTCA issue.  There, an individual brought claims against federal law enforcement agents, including claims of assault and battery.  A majority of the panel in Tekle agreed with the proposition that federal law enforcement officers have an affirmative defense to tort liability if they can demonstrate they were acting within the scope of a federal statutory privilege.  See 511

14

1  F.3d at 856-59 (Fisher, J., concurring); 511 F.3d at 862 (Kleinfeld, J., concurring).  Here,

2  however, the Government argues that *California* law, specifically Cal. Penal Code §§

3  196, 830.8(a), 835a, and 836 provides a privilege to federal law enforcement officers.[6]

4  Gov't Closing Br. at 22-23.   Neither Judge Fisher's nor Judge Kleinfeld's opinions in

5  Tekle speak to this issue directly, though neither rules out the possibility that California

6  privilege could be applied in a FTCA case**.**  The only federal law cited by the

7  Government are Navy regulations regarding when deadly force is justified, Gov't

8  Closing Br. at 23; the Government has not established that these regulations create a

9  privilege against civil liability.

10      Plaintiffs argue that Tekle is irrelevant, and that the Court should apply the

11  privilege afforded to police officers deploying force under California law, and not the

12  general tort self-defense afforded to ordinary persons.[7]   Cerros Pls.' Closing Br. at 13-

---

[6] Section 196 defines "justifiable homicide" by public officers, including when a homicide is "necessarily committed" to arrest a person charged with a felony who is "fleeing from justice," resisting arrest, or resisting "the execution of some legal process." Section 830.8 (a) provides that federal law enforcement officers may exercise the arrest powers of a California peace officer.  Section 835a states: "any peace officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use reasonable force to effect the arrest, to prevent escape or to overcome resistance." Section 836 provides the circumstances when a peace officer may execute an arrest without a warrant.  Whether Tate was entitled to arrest Catanho and Cerros is not disputed or at issue.

[7] In a confusing footnote at the very end of their brief, the Cerros plaintiffs argue that "Olson would only impact this case to the extent that the court accepts Officer Tate's representation that he was in imminent danger of death and the court determines that Officer Tate negligently put himself in the position of danger." Cerros Pls.' Closing Br. at 18 n.2.  The plaintiffs do not explain how Olson would effect that scenario and that scenario only.

16; Catanho Closing Br.[8] at 6-7, (citing <u>Martinez v. County of Los Angeles</u>, 47 Cal. App. 4th 334, 343, 349 and Cal. Pen. Code § 196.)  In doing so, though, plaintiffs argue the two standards are the same, since both allow for the use of "reasonable force." Cerros Pls.' Closing Br. at 18.[9]  This is incorrect.  Although both employ some sort of "reasonableness" analysis, under California law, "[p]olice officers are, in short, not similarly situated to the ordinary battery defendant and need not be treated the same. . . . [A police officer] is entitled to the even greater use of force than might be in the same circumstances required for self-defense."[10]  <u>Brown v. Ransweiler</u>, 171 Cal. App. 4th 516 (Cal. Ct. App. Feb. 24, 2009); <u>see also</u> <u>Munoz v. City of Union City</u>, 120 Cal. App. 4th 1077, 1108-09 (Cal. Ct. App. 2004).  As § 196 makes clear, police officers may assert a defense to homicide when "necessarily committed" to arrest or capture a fleeing felon. Moreover, the burden of proof is different when considering an officer's self-defense claim and that of a private person.  Generally, a private defendant bears the burden of establishing his affirmative defense.  Cal. Evid. Code § 500.  However, when a plaintiff accuses a police officer of using excessive force, there is a rule "imposing upon a plaintiff the burden of proving a police defendant used unreasonable force."  <u>Munoz</u>, 120 Cal. App. 4th at 1108-09.

---

[8] Both closing briefs that were filed by plaintiffs' counsel were entitled "Plaintiffs Estrate of Cerros, Alicia Cerros, Saul Cerros, Dinah Cerros, Lucilia Cerros, and Baudelio Cerros' Closing Trial Brief."  However, the contents of Dkt. No. 90 (e.g., "Co-counsel James Muller has filed a closing brief in [sic] behalf of the Cerros estate, et al.; counsel joins in that brief.") and the fact it was written solely by John Lee, who represents Catanho, suggest this brief was mislabeled and meant to serve as Catanho's closing brief.

[9] Catanho has joined in the Cerros plaintiffs' closing brief.  Catanho Closing Br. at 6.

[10] Cal. Penal Code § 835a suggests that law enforcement officers are not required to retreat in the face of resistance to a lawful arrest or detention.  The issue of retreat has not been raised in this case, however.

Although the Court rejects plaintiffs' arguments and finds that the standards of liability under California are different for law enforcement officers and private individuals, the Court need not resolve the <u>Tekle</u> issue in light of the Court's findings of fact and law below.  The result would be the same under either California's general self-defense privilege or the more deferential standard applied to law enforcement officers in the performance of their duties.  Accordingly, the Court applies the less deferential private person standard in the foregoing analysis.

**B.    Assault and Battery**

5.    To prevail on an assault claim, a plaintiff must establish that (1) the defendant (or the defendant's proxy)  "acted, intending to cause harmful or offensive contact;" and (2) plaintiff "reasonably believed that he was about to be touched in a harmful or an offensive manner."  CACI 1301 (Dec. 2008 ed.); <u>see also</u> <u>Lowry v. Standard Oil Co. of California</u>, 63 Cal. App. 2d 1, 6-7 (Cal. Ct. App. 1944).

6.    There are three essential elements of a claim for battery: (1) an intentional "act which resulted in a harmful or offensive contact with the plaintiff's person; (2) plaintiff did not consent to the contact; (3) the harmful or offensive contact caused injury, damage, loss or harm to the plaintiff."  BAJI 7.50 (Fall 2008 ed.); <u>Brown v. Ransweiler</u>, 171 Cal. App. 4th 516 (Cal. Ct. App. 2009).

7.     It is a defense to both the torts of assault and battery that the defendant (1) had a reasonable belief that he was going to be harmed and (2) he only used the amount of force that was reasonably necessary to protect himself.  CACI 1304 (Dec. 2008 ed.); BAJI 7.55 (Fall 2008 ed.); <u>Calvillo-Silva v. Home Grocery</u>, 19 Cal. 4th 714, 730 (Cal. 1998).  *See also* Cal. Civ. Code  § 50.  "If the person resisting a harmful or offensive contact uses excessive force, that person commits a battery as to the excessive force."  BAJI 7.55 (Fall 2008 ed.).

**C.    Negligence**

8.    "An action in negligence requires a showing that the defendant owed the

17

plaintiff a legal duty, that the defendant breached the duty, and that the breach was a proximate or legal cause of injuries suffered by the plaintiff." Ruiz v. Gap, Inc. 540 F. Supp.2d 1121, 1126 (N.D. Cal. 2008), quoting Ann M. v. Pac. Plaza Shopping Ctr., 6 Cal. 4th 666, 673 (Cal. 1993).

9.     Under California law, "the general rule is that all persons have a duty to use ordinary care to prevent others from being injured as the result of their conduct." Conte v. Wyeth, Inc., 168 Cal. App. 4th 89, 103 (Cal. Ct. App. 2008) (citing Cal. Civ. Code § 1714(a).)   An individual breaches this duty when he fails "to exercise the degree of care in a given situation that a reasonable person under similar circumstances would employ to protect others from harm." City of Santa Barbara v. Superior Ct., 41 Cal. 4th 747, 753-54 (Cal. 2007).

10.     "A person who, without negligence on his part, is suddenly and unexpectedly confronted with peril arising from either the actual presence of, or the appearance of, imminent danger to himself or to others, is neither expected nor required to use the same judgment and prudence that is required in the exercise of ordinary care in calmer and more deliberate moments.  His duty is to exercise the care that an ordinarily prudent person would exercise in the same situation." BAJI 4.40 (Fall 2008 ed.).

**D.     Wrongful Death**

11.     A plaintiff establishes a claim for wrongful death by demonstrating a "tort, i.e., negligence or other wrongful act, the resulting death, and the damages, consisting of the pecuniary loss suffered by the heirs." Quiroz v. Seventh Ave. Center, 140 Cal. App. 4th 1256, 1263 (Cal. Ct. App. 2006). See also Cal. Code Civ. Pro. 377.60 et seq.

**E.     Burden of Proof**

12.     In order to prevail on any of their claims, plaintiffs bear the burden of proof to establish the elements of each tort they allege by a preponderance of the evidence.  Cal. Evid. Code § 500; Finley v. United States, No. 07-cv-01939-DLJ EFB,

18

98-cr-00460-DLJ.2008 WL 2561594, at *7 (E.D. Cal. June 26, 2008).  However, "the [G]overnment bears the ultimate burden of proving" any affirmative defense.  ITSI T.V. Productions, Inc. v. Agricultural Associations, 3 F.3d 1289, 1291 (9th Cir. 1993); Cal. Evid. Code § 500.

**III.    Assault and Battery Claims**

13.    The Court finds and concludes that plaintiffs have established by a preponderance of the evidence that Tate intended to, and did, cause a harmful contact with both Catanho and Cerros' persons by firing the second and third shots.   Neither individual consented to this contact, and the contact was the legal cause of injury to Catanho and the legal cause of Cerros' death.  Accordingly, plaintiffs have met their burden in establishing a prima facie case for assault and battery.

14.    The Court also finds and concludes, however, that the United States has established by a preponderance of the evidence that, at the time he decided to fire his weapon, Tate had a reasonable belief that he was going to be harmed by the oncoming motorcycle driven by Cerros.   Plaintiffs mistakenly focus their argument on whether or not the motorcycle was actually going to hit Tate.  But the appropriate question is whether it was reasonable for Tate to believe that he was in threat of physical harm by the oncoming motorcycle.  Regardless of whether the motorcycle was on a path that actually was going to cause an impact, Tate's belief at the moment he acted was reasonable, as demonstrated by the testimony of eyewitnesses indicating they thought an impact was imminent and the testimony of plaintiffs' and the Government's experts and eyewitnesses, including other officers,  who all indicated that the motorcycle was extremely close to Tate as it neared and eventually passed him.[11]  Tate verbally commanded Cerros to stop and then fired one shot into the motorcycle to stop it.  Since

---

[11]  Plaintiffs reliance on Acosta v. City and County of San Francisco, 83 F.3d 1143 (9th Cir. 1996) is misplaced.  In that case, the officer who fired his weapon at fleeing thieves had never been in any danger whatsoever.

1 these attempts failed to eliminate the threat, given Tate's options in what plaintiffs

2 suggest was only .6 seconds (Cerros Pls.' Closing Br. at 7), his firing of the second and

3 third shots constituted a reasonable amount of force.

4      The fact that the shots entered Cerros' "side/back" is not dispositive, despite the

5 plaintiffs' argument otherwise.  Cerros Pls.' Closing Br. at 2; Catanho Closing Br. at 7-8.

6 The location of the entry wound on Cerros' anatomical back does not mean Cerros was

7 shot from behind.  As both experts explained, it is most likely that the men were leaning

8 forward on the motorcycle, with Catanho almost on top of Cerros, and his arms wrapped

9 around him.  Dr. Adams indicated that, particularly since it was so close to making a left

10 turn, it was most likely the motorcycle was leaning toward the left.  In this position,

11 Cerros' left side/back was tilted toward Tate, and the fact that a shot entered the

12 side/back of Cerros' left shoulder is consistent with Tate's testimony that he fired the

13 second and third shots while facing the side of the motorcycle.

14      15.    Since the Government has established an affirmative defense, the Court

15 enters judgment in favor of the Government and against Catanho and the Cerros

16 plaintiffs on their assault and battery claims.

17 **IV.   Negligence Claim**

18      16.    The plaintiffs have failed to meet their burden in establishing that Tate

19 acted in a manner inconsistent with that of a reasonable person under similar

20 circumstances.   Based on the testimony of eyewitnesses, the short time span over which

21 the events occurred (three seconds), and the high level of stress as the motorcycle

22 approached him, the Court cannot conclude that Tate's actions differed from those of an

23 ordinarily prudent, similarly situated individual.

24      17.    Since the plaintiffs have failed to establish the elements of the tort, the

25 Court enters judgment in favor of the Government and against Catanho and the Cerros

26 plaintiffs on their negligence claims.

27

28

**V.    Wrongful Death Claim**

18.    The Cerros plaintiffs have failed to establish that Cerros death was caused by Tate's negligence or another wrongful act.  Accordingly, they cannot recover on their wrongful death claim.  The Court thus enters judgment in favor of the Government and against the Cerros plaintiffs on their negligence claims.

19.    To the extent necessary, each of these conclusions of law may be deemed to be a finding of fact.

20.    Each party is to bear its own attorneys' fees and costs.


IT IS SO ORDERED.


Date:  April 28, 2009

_Christine A. Snyde_
_____
CHRISTINA A. SNYDER
UNITED STATES DISTRICT JUDGE